IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

EUGENIA C. MILLING,         }
                                      }
     Plaintiff,         }
                                      }     CIVIL ACTION NO.
v.                          }     05-AR-2376-S
                                      }
BOARD OF TRUSTEES OF THE    }
UNIVERSITY OF ALABAMA, d/b/a/ }
UAB                          }
                                      }
     Defendant.

## MEMORANDUM OPINION

Before the court is the motion of defendant, Board of Trustees of the University of Alabama d/b/a/ ("UAB"), for summary judgment on the above-entitled action brought by plaintiff Eugenia C. Milling, under Title VII of the Civil Rights Act of 1964 for gender discrimination and for retaliation. For the reasons that follow, the court will grant UAB's motion.

*Facts*[1]

Milling is the former head coach for the women's basketball team at UAB. She coached the team for 17 years, from the 1987-88 season until the 2003-04 season. Milling's final contract as head coach had a term of August 1, 2002 to July 31, 2005. After leading her team to its third consecutive losing season, however, Watson Brown, the Athletic Director ("AD") at UAB, terminated Milling's

---

[1] The parties dispute some of the facts pertaining to UAB's motion for summary judgment. For purposes of this memorandum opinion, the court will recite disputed facts in the light most favorable to Milling, giving Milling the benefit of every doubt.

employment on March 10, 2004, at the end of the second season of her final three-year contract.   Honoring the contract, UAB paid Milling the entire balance of her base salary through the contract's term.   The head coach hired to replace Milling was a female.   The records for the UAB women's basketball team for Milling's final seven seasons as head coach were 9-19 ('97-'98), 13-14 ('98-'99), 21-13 ('99-'00), 20-11 ('00-'01), 12-16 ('01-'02), 8-19 ('02-'03), and 9-19 ('03-'04).   The team reached the "Sweet Sixteen" of the NCAA tournament in 2000, and was one of the final eight teams at the National Invitational Tournament in 2001.

In the fall of 2003, Milling became aware of allegations by players of sexual harassment against Jonath Nicholas, who was one of Milling's assistant coaches.   Milling first learned of the allegations on or about September 8, 2003, when team member Chantell Thomas told her that she did not want Nicholas to be her mentor because she was "tired of [Nicholas] harassing" her. Milling says that according to Thomas, Nicholas was "talking to [Thomas] about [her] sexuality," and that he had told Thomas that she and other members of the team should have sex with visiting recruits for the men's basketball team.   Milling spent the next several days speaking to other members of the team, and many of the team members confirmed that Nicholas had subjected them to sexual overtures or harassment.   Although Milling attempted to contact Nicholas shortly after she learned of the allegations, Nicholas did

not return her telephone messages, and he left for extended recruiting trips despite Milling's specific instruction for him not to take them.

Meanwhile, sometime between September 24 and September 28, 2003, Milling attempted to meet with Brown to inform him of the allegations against Nicholas.  Brown was unable to meet when Milling tried to reach him, so Milling instead met with assistant AD Rick Christophel.  During that meeting, Milling gave Christophel copies of her notes from her meetings with the players.  Milling's notes indicated that at least four current or former team members had been sexually harassed by Nicholas.  On October 1, 2003, a few days after her meeting with Christophel, Milling had her first opportunity after learning of the alleged harassment to speak to Nicholas directly.  When Nicholas finally returned one of her calls on that day, Milling instructed him to stop calling players and recruits, to cease all contact with players, and to work in the office until she could more properly assess the situation. Although she knew she was supposed to consult with Brown before making any coaching-staff decisions, Milling made the decision on her own because she considered the matter to be serious enough to merit an exception.

According to Milling, Brown became very angry when he received Milling's notes regarding the alleged sexual harassment.  Milling says that Brown called her and yelled at her for taking Nicholas

off the floor, and that he expressed worries that the story would reach the media. When the two finally met in October 2003, Milling told Brown that they needed to contact Student Affairs to report the allegations. Brown nevertheless "considered the matter closed" after AD Robert Staub asked Nicholas about the alleged incidents, and Nicholas denied that they took place.

Whether with or without Brown's permission, Milling arranged for a meeting with Connie Pruett, the UAB Director of Employee Relations, and with Ed Kennedy from the UAB Legal Department. At the meeting, which was held on October 14, 2003, the three individuals discussed the allegations against Nicholas. The three determined that Nicholas would be removed from on-court coaching and would be given duties that did not involve player contact, although Milling had already implemented this course of action before the meeting. On or about October 24, 2003, Milling, Pruett, and Kennedy spoke again to discuss terminating Nicholas, after Nicholas failed to respond to a request that he accept different job duties.

Neither the Office of Student Affairs nor the HR Department ever formally investigated the allegations against Nicholas, despite Milling's continued insistence that they conduct an investigation. Pruett testified that Human Resources did not conduct an investigation because it was a Student Affairs matter, and that Student Affairs did not investigate because Milling had

4

already met with the players to document the information.  Despite
having not conducted its own investigation, the UAB administration
never made a determination as to whether or not Nicholas had
actually sexually harassed any members of the women's basketball
team.   Importantly, Nicholas was not fired as a result of the
allegations against him.

During the 2003-04 season, Milling continued to complain to
Brown and to Pruett that Nicholas was interfering with the team.
Milling was upset that Nicholas continued to attend practices and
games, and that he continued to approach and make comments aimed at
players, after Milling — with the express support of the UAB
administration — specifically told Nicholas to stay away from the
team and the individual players.  Milling says that Brown did not
take adequate action when she continued to voice concerns about
Nicholas's behavior.  Brown insists that he tried to offer help.
Although UAB says that Brown had given Milling the authority to
fire Nicholas, Milling says that Brown would not permit her to fire
Nicholas because he was afraid of the bad publicity that the
program would receive if the story reached the public.

Eventually, in the wake of Milling's continued complaints,
Brown reassigned Nicholas so that Nicholas no longer reported to
Milling.  Shortly thereafter, on or about February 3, 2004, Pruett
told Milling that she should not engage Nicholas in any way, and

that if Nicholas came into contact with any members of the women's basketball team, she should report the incident to Brown.[2]

During her last several years with the women's basketball team, Milling experienced struggles as head coach that were unrelated to issues involving sexual harassment.  First, according to Brown, Milling had lost control of the team and the respect of the players.  Brown testified that he "just didn't feel the respect on the floor.  [Milling] would get on one or whatever and they'd kind of walk away from her."  According to notes Brown took at meetings on May 16 and 28, 2003,[3] members of the team remarked that Milling "does not have a feel for the game because she never played," that "players [are] not treated fairly," and that "the program is unorganized — going downhill."  Brown's notes further say that team members complained that they "don't learn anything" and that Milling blamed players for not executing the plays when the team lost.  According to Brown's notes, at least three team members said during these meetings that they had lost respect for Milling.

---

[2] On December 23, 2003, Nicholas, who is black, filed an EEOC charge of discrimination and retaliation against UAB.  He based much of his charge on Milling's alleged mistreatment of him while he was an assistant coach on Milling's staff.  On January 27, 2005, Nicholas filed a lawsuit against UAB, alleging race discrimination, gender discrimination, and retaliation in violation of Title VII.  His action was dismissed on motion for summary judgment and he has appealed.

[3] Milling does not dispute that Brown's notes are excerpts of the May 16 and 28, 2003 meetings, but she objects to the notes as being hearsay.  Milling also says that Nicholas had encouraged the players to make the complaints against her.

Brown informed Milling of the complaints from the various team members, although he did not specifically identify the women who made individual remarks.  Brown instructed Milling to formulate a plan to address the issues that the team members voiced, and he told her to prepare a speech to give to the team.  In accordance with Brown's directive, Milling delivered a speech at a team meeting shortly thereafter.  In her speech, Milling expressed remorse for the situation that she believed that she created, telling the players, among other things, that

> [l]ater after I had reflected over time on the situation, I was upset and disappointed and it was really painful — not that you had gone to Coach Brown but that I had created a situation where you couldn't come to me or were afraid to come to me. . . .  I have come to recognize and admit some weaknesses in myself and to understand that I have made some serious mistakes.  I can see now how I have contributed significantly to each issue. . . .  I focused only on winning.  The truth is — I only succeeded in putting pressure on you and frustrating you. . . .  I have lost my connections with you.  In meetings that we had during the season I [heard] several times mentioned that the coaches were on one side and the players were on another side.  I didn't ever realize how true that was.  At times I saw a problem, but didn't understand it so I pushed harder and in doing so separated us even more.  What's so painful now is that this is all my doing.  I became unapproachable to you — I pushed you away.  When things are going poorly and a person is unapproachable, it makes you angry and you feel you can't do anything about it — it creates fear.  I didn't understand when you said you were afraid of be, but I can see it now.

Despite the general tenor of the meeting, Brown made it clear to the team that he supported Milling as the head coach.

During the final years of Milling's tenure, the women's basketball team also experienced on-court difficulties.  When

7

Milling signed her penultimate coaching contract with UAB in May

2000, then AD Gene Bartow wrote to her in a memorandum:

> In meeting with the President and Vice President last
> week they suggested that I put some things in writing
> about this new two-year agreement. It is the opinion of
> our administration that when you look at the last five
> years, year by year, we need improvement. When you look
> at the different letters and calls that we have received
> here in the administration, you take into consideration
> it hadn't been the greatest five-year period. Now what
> happened during the last thirty days of our season this
> year was wonderful. Winning and playing for the
> conference championship in Louisville was tremendous and
> going to Eugene, Oregon and beating Oregon and
> Mississippi State was even better. However, when you
> weigh that thirty day period with everything else that
> seemingly has happened these last five years, things do
> not seem all that rosy.
>
> As you go on this new two-year agreement, I think that
> you should strive: 1. To continue the winning ways of the
> last thirty days of your season this past year. 2. To
> increase attendance. 3. To continue to work within your
> budget and try to create more revenues. 4. To do a
> better job in retaining the players who are recruited
> into this program.

Although Milling's team advanced to the "Sweet Sixteen" at the NCAA

tournament during the 1999-2000 season (the season immediately

preceding Bartow's memorandum), and although the team had a winning

season and enjoyed some success at the National Invitational

Tournament the following year, Milling's teams sustained three

consecutive losing seasons after that. Moreover, the average

attendance at women's basketball games went from 976 in 2001-02, to

325 in 2002-03, to 365 in 2003-04, while revenue generated by the

women's basketball program declined from $5,317, to $4,277, to

$2,763 during those same years. And Milling also continued to lose

players; during the four seasons between fall 1999 and spring 2003, at least 12 players left the program, and at least three freshman quit the team during the 2001-02 season because of Milling.  Based on these trends, Brown says that he "didn't feel like we were making the progress that I wanted to make."

Brown called Milling to a meeting after the 2003-04 season ended, on March 10, 2004.  During that meeting, Brown gave Milling the option to resign.  Brown told her that if she did not resign, she would be fired.  Milling asked Brown for time to speak to her lawyer before making the decision, but Brown refused and told her that he was going to publicly announce her termination or resignation in two hours, one way or the other.  For aught appearing, Milling did not accept Brown's offer to resign, and Brown officially fired her later that day.  According to Brown, he decided to fire Milling because of the unsatisfactory won-lost record and lack of discernable progress of the team, and because he believed that Milling had lost control and the respect of her players.

Milling filed an EEOC charge against UAB on September 3, 2004.  She filed this action on November 23, 2005.

### Summary Judgment Standard

In considering a Rule 56 motion, the court must construe the evidence and make factual inferences in the light most favorable to the nonmoving party.  *See Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  The
court may enter summary judgment only if it is shown "that there is
no genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).
At this juncture, the court does not "weigh the evidence and
determine the truth of the matter," but solely "determine[s]
whether there is a genuine issue for trial."  *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 242-43 (1986) (citations omitted).  This
determination involves applying substantive law to the substantive
facts that have been developed.  A dispute about a material fact is
genuine if a reasonable jury could return a verdict for the
nonmoving party, based on the applicable law in relation to the
evidence developed.  *See id.* at 248; *Barfield v. Brierton*, 883 F.2d
923, 933 (11th Cir. 1989).

*Analysis*

Milling contends that UAB violated Title VII by subjecting her
to unlawful discrimination on the basis of gender and by
retaliating against her for engaging in statutorily protected
activity, when it terminated her employment in the spring of 2004.
UAB counters that considering the evidence in the light most
favorable to Milling, it is entitled to judgment as a matter of law
on both of Milling's Title VII claims.

**I.  Gender Discrimination**

10

Title VII makes it unlawful for an employer to discharge a female, or otherwise discriminate against her with respect to her compensation, terms, conditions, or privileges of employment, because of her gender. *See* 42 U.S.C. §2000e-2(a)(1).

In order to recover for gender discrimination, Milling must first establish a *prima facie* case, which can be established using either direct or circumstantial evidence of discriminatory animus. In cases such as this one, where Milling offers only circumstantial evidence of discrimination, the sufficiency of her Title VII claim is evaluated under the familiar three-part framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089 (1981). *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*). To satisfy her *prima facie* burden, she must show: (1) she is a member of a protected class; (2) she was subject to adverse employment action; (3) her employer treated similarly situated male employees more favorably; and (4) she was qualified to do the job. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (citations omitted). If the plaintiff successfully establishes a *prima facie* case, the defendant-employer must articulate a legitimate, nondiscriminatory reason for the challenged employment practice. Finally, if the employer articulates one or more nondiscriminatory reasons, the plaintiff must present sufficient evidence to permit a reasonable fact-finder

11

to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *See Thomas v. Aventis Pharmaceuticals*, 177 Fed. Appx. 54 (11th Cir. 2006).

In the third step of the *McDonnell Douglas* framework, the pretext analysis, the plaintiff may succeed by "either directly persuading the court that a discriminatory reason more likely motived the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). In other words, the plaintiff must present sufficient evidence to create a genuine issue of material fact that each of the defendant-employer's articulated reasons is pretextual, or else the employer is entitled to summary judgement. *Chapman*, 229 F.3d at 1024-25.

UAB does not deny that Milling is a member of a protected class, was subject to an adverse employment action, and was "qualified" for the position she held.[4] Therefore, to establish a *prima facie* case of gender discrimination, Milling need only point to a similarly situated male colleague who received more favorable treatment. Conspicuously, Milling does not claim to have been replaced by a male, whereas the undisputed facts indicate that she

_____

[4] UAB's proffered reasons for firing Milling – the team's won-lost record/lack of progress and Milling's loss of control/respect of the team members – appear to boil down to a belief that Milling was not qualified to perform the duties as head coach of the team. Perhaps for strategic reasons, UAB does not argue that Milling cannot establish this prong of the *prima facie* case. Even if it had advanced this argument, the court would find that there is an issue of fact with regard to that element, precluding a grant of summary judgment on this basis alone.

was not terminated until after she coached the women's basketball team to three consecutive losing seasons and had established a tenuous rapport with the collective membership of her team.[5]

Despite the absence of the fact from the materials furnished by the parties, the court takes judicial notice that UAB filled the head-coach position that was left vacant by the termination of Milling with another female.  *See Nicholas v. Bd. of Trustees of the University of Alabama*, 2:05-cv-0176-UWC (N.D. Ala., Sept. 12, 2006) (Doc. No. 34), at p. 4, ¶ 15.  Therefore, Milling does not point to UAB's having replaced her with a male counterpart as the classic support for a *prima facie* case.  Milling identifies two individuals as to whom, she argues, she is similarly situated and to be fairly compared.  The first, Nicholas, was an assistant coach on Milling's staff before he was removed from that position.  The second, Brown, was the head coach of the football team from 1995 to 2006.  "To show that employees are similarly situated, [] plaintiff must show that the employees are similarly situated in all relevant respects. . . ."  *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003).  When analyzing purported comparators, the most important facts are both the duties and the nature of the

---

[5] Milling objects to the consideration of Brown's notes, which contain Brown's summaries of concerns voiced by individual members of the team.  The court agrees that these notes may be hearsay, and it will not consider them. However, the speech that Milling delivered to her team in the fall of 2003 is not hearsay.  That speech, the contents of which Milling does not dispute, unambiguously reveals that Milling understood that she had lost the control and respect of the team members.

reasons given for differing adverse employment actions and the nature of the adverse employment actions themselves. *See Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001). The quantity and quality of the comparator's "misconduct" must "be nearly identical to prevent courts from second-guessing employers' reasonable decisions . . . ." *Maniccia*, 171 F.3d at 1368.

Construing the evidence in the light most favorable to Milling, neither Nicholas nor Brown is similarly situated to Milling. First, Nicholas was an *assistant* coach of the women's basketball team, not the *head* coach. As head coach, Milling was solely responsible for the success or failure of the team. When she and UAB agreed to a two-year extension of her contract after the 1999-2000 season, Athletic Director Bartow told her — not her assistants — that she should strive to win games, increase attendance, work to create more revenues, and do a better job retaining recruits. As head coach, Milling's was the face that boosters, fans, and the media associated with the women's basketball team. By definition, Nicholas's job was to *assist* Milling to achieve the goals for the team set forth by the UAB administration and athletic department, but Milling was ultimately responsible. The court is well aware that head coaches of major college sports teams are subject to intense scrutiny and criticism from various angles, but when their teams win, they are the ones who bask in the glory. Conversely, they must bear the brunt of the

negative attention when their teams lose.  Nicholas, as an assistant coach, was not in either position.

Just as Nicholas is not similarly situated to Milling, neither is Brown.  Milling contends that Brown, whose football teams had enjoyed just two winning seasons while having suffered nine losing seasons as of the date on which Milling was terminated, was a less successful coach than she but was not fired in 2004.  The court agrees with UAB that Brown is not a proper comparator.  There is such a host of differences between a men's football program and a women's basketball program — such as public-relations considerations, level of media and fan interest, amount of revenue generation, and availability of qualified coaches — that any useful comparison of head coaches of the two on the basis of won-lost record alone is nearly impossible.  *See*, *e.g.*, *Horn v. University of Minnesota*, 362 F.3d 1042 (8th Cir. 2004); *Stanley v. University of So. Cal.*, 13 F.3d 1313 (9th Cir. 1994).  Perhaps more importantly, there is no evidence that Brown was ever a source of discord amongst his teams.  Milling, on the other hand, admitted in the fall of 2003 that she had created a situation in which her players did not feel they could come to her as a coach, and that the situation was "all her doing."  Brown and Milling are not similarly situated for purposes of Title VII.  Although the record does not reflect it, it is now public knowledge that Brown has departed UAB.

15

To the extent Milling attempts to prove that UAB discriminated against her on the basis of gender because it did not offer her proper support in handling the situation with Nicholas, any of Milling's allegations that could possibly support such a claim are time-barred.   A Title VII plaintiff has 180 days from the allegedly unlawful conduct in which to file an EEOC charge.   42 U.S.C. § 2000e-5(e).  Milling filed her EEOC charge on September 3, 2004, so only events that took place on or after March 7, 2004 can support a Title VII discrimination claim.   Milling was fired on March 10, 2004, and other than her termination, all of the events Milling believes to have constituted acts of gender discrimination occurred before March 7, 2004.

Because the undisputed evidence reveals that Milling cannot point to any similarly situated male employee who received more favorable treatment than she did, Milling cannot establish a *prima facie* case of gender discrimination under Title VII.   The court therefore need not consider whether UAB's stated reason for firing her was pretextual.   UAB is entitled to summary judgment on Milling's claim of gender discrimination.

## II.  Retaliation

In Count Two of her complaint, Milling alleges that UAB retaliated against her for engaging in statutorily protected activity in violation of Title VII.  In order to establish a *prima facie* case of retaliation under Title VII, Milling must prove that

(1) she participated in an activity protected by Title VII, (2) she suffered an adverse employment action, and (3) there is a causal connection between the participation in the protected activity and the adverse employment action. *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000).

In order to establish the first element of her *prima facie* case, Milling must show that she engaged in protected participation or opposition within the scope of § 704(a) of Title VII. *See E.E.O.C. v. White & Son Enters.*, 881 F.2d 1006, 1012 (11th Cir. 1989). That section provides:

> **It shall be an unlawful employment practice for an employer to discriminate against any of his employees** or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, **because he has opposed any practice made an unlawful employment practice by this subchapter,** or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (emphasis added). Therefore, the employment practice complained of by a Title VII retaliation plaintiff must be deemed unlawful under the terms of 42 U.S.C. § 2000e, or the employee must at least have a good-faith belief that the employment practice is unlawful under those terms. *See* 881 F.2d at 1012, n.5. 42 U.S.C. § 2000e-2(a) states that "it shall be an unlawful employment practice for an employer—"

17

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Milling says that she engaged in statutorily protected activity when she complained of the behavior of Nicholas "which violated laws against sexual harassment," Compl. (Doc. No. 1), at 8, and when she continued to insist that UAB investigate the matter.

The court respectfully disagrees with Milling.  According to her, Nicholas's behavior was directed exclusively at members of the women's basketball team, who were *students* of UAB — not *employees* of UAB.  42 U.S.C. § 2000e-2(a), however, is clearly aimed at discrimination with respect to employees or potential employees. If Milling had alleged that UAB retaliated against her for reporting that Nicholas had sexually harassed her or some other UAB employee, then she might be able to establish a *prima facie* case of retaliation.[6]  But here, Milling says she reported Nicholas for sexually harassing *non-employees*.  Nicholas's alleged conduct,

---

[6] Milling says that UAB refused to investigate the allegations against Nicholas because she is female, but there is no evidence that Milling complained – before she was fired – that UAB was discriminating against her on this basis. Thus, there can be no causal connection between this alleged act of discrimination and the purported retaliation.

18

while unacceptably boorish, flagrantly offensive, and extraordinarily classless and disrespectful, simply did not amount to an "unlawful employment practice," as that term is defined in Title VII. *See*, *e.g.*, *Zmora, et al. v. Minnesota, et al.*, 2002 WL 539075, at *7-*8 (D. Minn., Apr. 10, 2002) (finding no cognizable Title VII retaliation claim because subject of the allegedly unlawful discrimination was a student at, not an employee of, defendant university).

To establish a claim for retaliation under Title VII, an employee's belief that her employer has engaged in unlawful discrimination must be both in good faith and objectively reasonable in light of the facts and record presented. *See Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). Milling, who is undoubtedly familiar with NCAA regulations prohibiting student-athletes from receiving payment for their participation in college sports, was aware that the members of her team were not playing basketball as "employees" of UAB. If Milling believed that UAB was violating Title VII when Nicholas harassed the members of her team, that belief was both subjectively and objectively unreasonable. Title VII does indeed proscribe retaliation, but only a particular species of retaliation. Had Milling claimed that UAB retaliated against her for complaining about UAB's noncompliance with the substantive provisions of *Title IX* (as distinguished from those of Title VII), or had she asserted

a § 1983 claim against Brown individually for retaliating against her for exercising her rights guaranteed under the First Amendment, then Milling may have been able to sustain her claims under those theories.  But Milling has not asserted either of these claims, and the court must not prosecute her case for her.

Because Milling cannot establish a *prima facie* case of retaliation on Milling's claim for unlawful retaliation in violation of Title VII, the court will not undertake to determine whether Milling can point to any evidence that might cause a reasonable jury to find that UAB's stated reasons for firing her were pretexts for unlawful retaliation.  UAB is entitled to judgment as a matter of law on Milling's retaliation claim.

### Conclusion

For the foregoing reasons, UAB's motion for summary judgment will be granted.

DONE this 22nd day of February, 2007.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE